IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF FLORIDA

Panama City Division

SHELLEY WILLIAMS, as Personal

Representative of the Estate of Arthur Williams,

a deceased Individual,

Plaintiff,

vs.                                         Case No.

Jackson County; Jackson County Jail

and Correctional Facility;

Jackson County Board of County Commissioners;

The State of Florida; Florida Department of

Corrections; Chris Brannon, Warden,

Jackson County Jail and Correctional Facility,

Defendants.

_____/

## **COMPLAINT**

Plaintiff, Shelley Williams, as Personal Representative of the Estate of

Arthur Williams, sues Defendants, Jackson County; Jackson County Jail and Correctional Facility ("Jackson County Jail"); the Jackson County Board of County Commissioners ("County Commissioners"); The State of Florida ("Florida"); Florida Department of Corrections ("FDC"); Chris Brannon, Warden, Jackson County Jail and Correctional Facility ("Warden Brannon"); and avers:

## PARTIES, JURISDICTION AND VENUE

### Introduction

1.      This is an action to redress the wrongful death of Arthur Williams while in custody at the Jackson County Jail, and alternatively for violation of Arthur Williams's Constitutional right under the 8th Amendment as is more fully alleged herein.  Plaintiff's decedent, Arthur Williams ("Williams") was an 82 year old, mentally incompetent male who was brutally and horrifically murdered by his cell mate, Frederick Patterson ("Patterson"), while being held at the Jackson County Jail on January 15, 2018.  At the time of his death, Williams was being held in the Jackson County Jail after being arrested by the Jackson County Sheriff's Office on October 18, 2017 for state charges including loitering or prowling, trespass on property, aggravated stalking, attempting to lure or entice a child under 12 years, and providing false information to police.  On January 4, 2018, Williams was adjudicated incompetent to proceed in his criminal case by reason of mental illness pursuant to Florida Statute section 916.106(11) by the Honorable

Christopher Patterson, Circuit Court Judge of the 14th Judicial Circuit, Jackson County, Florida.  Judge Patterson specifically found that Williams was incompetent to proceed with the trial of the case, pre-trial proceedings, entry of a plea, violation of probation or community control, sentencing, hearing on issues regarding a defendant's failure to comply with court orders or conditions, and other matters where the mental competence of the defendant is necessary.  The court ordered all further legal proceedings against Williams stayed, and committed Williams to the Department of Children and Families to be placed in a mental health treatment facility pursuant to Florida Statute sections 916.13(1) & (2).  The Court further directed the Clerk to forward forthwith a copy of his Order together with all supporting findings, including reports of experts, psychiatrists, psychologists, and social workers relative to Williams's mental state to the Department of Children and Families ("DCF").  The Court further ordered that Williams be transported forthwith to a treatment facility designated by DCF. Notwithstanding this order, Williams remained in the Jackson County Jail until his death on January 15, 2018.  Plaintiff alleges that Arthur Williams's Constitutional Rights were violated, or alternatively that the Defendants were negligent, by pairing Williams with Patterson as cellmates.  Patterson was a known killer having previously savagely murdered a cellmate due to the cell-

mate's alleged sexual orientation.  Following Williams's murder, Patterson admitted that he had planned Williams's murder for weeks, and had killed Williams because of the nature of the state court charges against Williams.

2.     The Plaintiff, Shelley Williams, is the Personal Representative of the Estate of Arthur Williams, deceased.

3.     The Jackson County Jail and Correctional Facility is jointly operated by Jackson County through the Jackson County Board of County Commissioners, and the State of Florida through the Florida Department of Corrections.  Jackson County is a political subdivision of the State of Florida organized and existing under the provisions of the Florida Constitution.

4.     Warden Brannon was an employee of Jackson County and/or the State of Florida, and was ultimately responsible for the management and operation of the Jackson County Jail.

5.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of law, of rights secured by the Eighth Amendment to the Constitution of the United States of America.

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

7.     Alternatively, this is an action for wrongful death brought pursuant to the Florida Wrongful Death Act, section 768.16 – 28, Florida

Statutes.

8.     Venue lies in this district pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to causes of action set forth in this Complaint occurred in the United States Northern District of Florida.

9.     All conditions precedent to the filing of this action have been fulfilled or have been waived.

## GENERAL ALLEGATIONS

### Arthur Williams

10.     Arthur Williams was an eighty-two (82) year old Canadian citizen with mental health issues who had never been arrested in his life prior to October 18, 2017.

11.     On October 18, 2017, Williams was arrested by the Jackson County Sherriff's Office on several state criminal charges. As a result of the arrest, Williams was incarcerated and held at the Jackson County Jail.

12.     At the Jackson County Jail, in direct violation of the Jackson County Jail's own Classification Policy, Williams was placed in a cell with a violent murderer, Frederick Patterson ("Patterson"), a 25 year old ex-MMA (Mixed Martial Arts) fighter, who had previously murdered another cellmate while incarcerated due to the cellmates alleged sexual orientation.

## Jackson County Jail's Classification Policy

13.   Jackson County Correctional Facility ("Jackson County Jail" or the "Jail") has a Classification Policy for inmates.

14.   According to that Classification Policy (§ B): "The main objective of classification is to house inmates in the type of quarters that best meet the institutions security need, and provide adequate protection from other inmates. The housing should be no more restrictive than is justified by the inmate's security designation."

15.   According to that Classification Policy (§ F), "Particular care should be exercised in separating the aggressive from the non-aggressive inmates at all times."

16.   The Classification Policy further provides that:

G. Special attention must also be given to the security and housing of special category inmates such as:

   1. Elderly and handicapped inmates.

   2. Alcohol, narcotic and drug addicts.

   3. Mentally ill inmates.

   4. Sexual deviates, homosexuals.

   5. Suicide risks

   6. Inmates who:

      a.   Must be housed separate from general population for their own protections or protection from others.

b.   Co-defendants requiring separation due to circumstances of arrest.

c.   Inmates who have a personal conflict.

7. Inmates with certain medical conditions.

17.   The Classification Policy further provides that "H. The information on an inmate falling into any of these categories will be recorded in the inmate's personal file and will remain a matter of inmates personal history file."

18.   The Classification Policy also provides "K. During incarceration, an inmate's classification will change periodically. Normally, these changes will be affected by routine court action and disposition. However court action, family problems, stress of confinement and many other factors can create severe behavioral change in the inmate that will affect classification and housing categories. When such behavioral change is noticed, it is necessary that it be reported to the OIC for evaluation, counseling and further action if needed. It is the responsibility of the classifying officer to see that inmates with classification changes are housed correctly and that information is properly documented."

19.   On or about October 19, 2017, Williams filled out a PREA Sexual Violence Screening Form (the "Screening Form").

20.   On his Screening Form, Williams indicated:

(a)   That he was deaf and he wrote "hard hearing" (No. 3);

(b)   That it was his first time being incarcerated (No. 4);

(c)   That he was concerned about his ability to defend himself while incarcerated based on his size, age, mental status, first time incarcerated, or sexual preference (No. 8); and

(d)   That he was not comfortable being housed in general population based on his answers to the above questions (No. 12).

## Frederick W. Patterson III

21.   Patterson was originally sentenced to prison as a result of being convicted of two counts each of burglary of a dwelling and trafficking in stolen property.

22.   On October 21, 2013, Patterson was sentenced to five years, 10 months and 22 days in prison.

23.   As a result, Patterson was incarcerated at the Apalachee Correctional Institute.

24.   Patterson began racking up serious disciplinary infractions in short order.

(a)   He was participating in riots and given an infraction for disobeying an order less than a year into his confinement (June 6 and 9, 2014, respectively);

(b)   In Patterson's second year of confinement, he received infractions for, inter alia: an unauthorized absence, tattooing, disorderly conduct, committing an obscene profane act, and destruction of stolen property.

25.   Before the second year of Patterson's confinement would finish, Patterson murdered his then-cellmate at the Apalachee Correctional Institution, which occurred on October 2, 2015.

26.   According to the Probable Cause Affidavit, Patterson was placed in a cell with another inmate, Scott Collinsworth, (Patterson's first-murdered cellmate) at 11:12 AM, and at 12:51 PM — less than two hours later — Collinsworth was found "lying on the floor of the cell in a pool of blood" and was declared deceased shortly thereafter.

27.   In an attack that was all too similar to Patterson's 2018 murder of Williams, Patterson killed Collinsworth by "repeatedly striking Collinsworth with his fists, feet, elbows and knees, even after Collinsworth had lost consciousness, said act . . . evincing a depraved mind regardless of human life."

28.   Patterson was found guilty of murder in the second degree in the killing of Collinsworth and was sentenced to life in prison on February 1, 2018.

29.   Thus, Patterson was facing a life sentence for a crime that he had admitted committing prior to his transfer to the Jackson County Jail.

**Patterson's Disciplinary History after His First Murder**

30.   After murdering his cellmate at Apalachee Prison, Patterson was moved to the Santa Rosa Correctional Institution (SARCI).

31.   At SARCI, Patterson continued to engage in violent conduct: he was charged with four counts of battery on a law enforcement officer from an incident in which he attacked an officer and repeatedly punched him in the face, that required multiple officers to subdue him, and which continued even after he had been subdued.  Patterson continued to attack the guards even while he was restrained with leg restraints and a waist chain, striking one guard with the black box device (which is a hard plastic/metal box secured over the handcuff key holes to prevent tampering).

32.   This incident, which occurred on August 26, 2017, shows that Patterson's violent tendencies were not the only reason he presented an extreme and special risk to others:

(a)   Patterson claimed that he was under the influence of "K-2 (synthetic cannabanoids)" at the time of his attack on the SARCI guards;

(b)   Patterson was extremely dangerous because he was devious and calculating, and he admitted to having used a toothpaste cap

in the locking mechanism of his cell door which disabled the locking mechanism; and

(c)   Patterson was seen "smirking/smiling" shortly after assaulting several officers.

## Patterson's Transfer to Jackson County Jail

33.    Patterson was transferred to the Jackson County Jail on October 31, 2017.

34.    The Detention Report for Patterson's transfer shows that he had an open charge for murder in the second degree.

35.    Jackson County Jail received a copy of the Florida Department of Corrections Law Enforcement Inmate Custody Report dated 10/30/2017 for Patterson from SARCI prior to his transfer, which showed Patterson's extensive disciplinary history and that he had an open murder charge.

36.    On October 31, 2017, Sgt. Morehead of the JCJ filed a written report that the facility was receiving Patterson and that he had been advised that Patterson had an open count of Second Degree Murder (the "Patterson Intake Incident Report").   The Patterson Intake Incident Report further indicates that Lt. Merritt was notified of Patterson's transfer and that he had an open murder charge.   Lastly, the Patterson Intake Incident Report indicates that "Inmate Patterson's cell arrangements were predetermined

prior to his arrival. Inmate Patterson was placed in Med-I as arranged."

37.   On or about October 31, 2017, Sgt. Watford completed a Classification Worksheet for Patterson.

38.   The Patterson Classification Worksheet is barely filled out: the Worksheet has felony checked at the top and Patterson was apparently classified as medium risk.

39.   The section of the Classification Worksheet for "Description of Charges" is left entirely blank; there is no mention that Patterson was not only facing an open murder charge (to which he had confessed) but that the murder was of his cellmate at another correctional facility.

40.   The "Inmate History" section of Patterson's Classification worksheet was also left blank and there was no check mark next to "Violent Crime / History of Violence."

41.   Similarly, the "Comments" section of the Classification Worksheet has no information on Patterson's extensive history of violence and disciplinary infractions while incarcerated.

42.   On November 11, 2017, a Weekly Inmate Confinement Review Form for Patterson was filled out. This Form indicates that Patterson was in Med-1 for "Protective Custody" but the form does not identify the reason or basis for the protective custody; instead, the comments state: "2nd Degree

Murder.  Remains as is until room opens in Max.  Remains as is."

43.    On November 21, 2017, the "Initial Classification Remarks" page of the Classification Worksheet was updated to reflect that "Subject charged with [sic]. Hold for Santa Rosa County."  The Classification Worksheet was not updated to reflect these charges nor does this page, "Initial Classification Remarks" page, identify that the charges were for four counts of battery upon a law enforcement officer, which was an incident that the JCJ already knew about.

44.    On December 18, 2017, Patterson was given a disciplinary infraction for fighting. This incident was not noted anywhere on Patterson's Classification Worksheet.

45.    The next day, on December 19, 2017, an "Inmate Confinement Order / Admission or Release" was entered transferring Patterson from Med-1 to Max; neither of the boxes related to supervision are checked and the only comment is "Cleared by [illegible]."

**Williams was Declared Incompetent Prior to His Murder**

46.    On December 19, 2017, Forensic Psychologist Dr. Michael D'Errico examined Williams to assess whether he was competent to stand trial. Dr. D'Errico concluded that:

Based on all available information. Mr. Williams appears to meet the criteria for involuntary competency restoration treatment as manifestly

dangerous to himself and others. As such, the least restrictive treatment alternative in his case would be involuntary hospitalization within a state forensic, psychiatric facility. Once involved in treatment, it may require as many as six months to restore Mr. Williams to within an adequate level of trial competency.

47.    The DCF Clinician who examined Williams, Dr. Troy McCoy, agreed that he was incompetent:

"Nursing staff in the jail consider him to be very peculiar and unusual and believe he is delusional at times. Loose associations. Perseverations. Somewhat distraught. Medical info is a need. Hearing loss and use of hearing aids."

48.    Dr. McCoy later stated that: "**This clinician did not advise that the commitment be contested by DCF. . . . I am glad at this time that no one can say that the defendant died in jail because DCF contested the commitment and delayed admission.**"

49.    On January 4, 2018, Judge Christopher Patterson of Fourteenth Judicial Circuit Court of Jackson County entered an Order (the "Incompetency Order") declaring Williams incompetent to proceed and that committed him to the custody of Florida's Department of Children and Families ("DCF").

50.    The Incompetency Order found that "[t]he Defendant is incompetent to proceed due to the Defendant's Mental Illness."

51.    The Incompetency Order further found that Defendant was

incompetent to proceed with any stage of the trial or any "other matters where the mental competence of the defendant is necessary."

52.   A copy of the Incompetency Order was sent to the Jackson County Sherriff's Office by the Court on January 5, 2018.

53.   Also on January 5, 2018, the Forensics Admissions Coordinator for DCF, Rita Watson, emailed Deputy Bruce Ward and Deputy Watson of the JCJ regarding Williams' incompetency and that he was being committed to DCF.

54.   Neither Deputy Ward nor Deputy Watson responded to this email.

55.   On January 8, 2018, Rita Watson sent a follow up email because there had been no response.

56.   Deputy Ward did not respond to the Forensic Admission Coordinator's email until the evening of January 12, 2018 and said he was unable to open the attachment.   The Forensic Admission Coordinator responded first thing the next morning, January 12, 2018, with the password.

57.   Neither Deputy Ward nor Deputy Watson nor anyone else from Jackson County Jail sent any emails to DCF regarding Williams's incompetency and pending admission.

58.   Despite already having had ample reason to believe that

Williams was mentally incompetent and despite being informed by the Court that he was adjudged incompetent and by DCF's Forensic Admissions Coordinator that he was being committed to DCF, there was no change to Williams' classification; amazingly, there is not even a single notation on his Classification Worksheet related to Williams's incompetency or relating to his mental health.

59.     Nor was Williams transferred to a mental health unit or protective custody nor were any other measures that would have been appropriate and reasonable taken to protect his safety.

## The Murder

60.     Williams was found deceased within his jail cell on January 15, 2018 by staff at the Jackson County Jail.  At that time, Williams was sharing a jail cell with one Frederick Patterson.  Williams was found lying face down in a large pool of blood inside the cell shared with Patterson.  Patterson was subsequently interviewed by law enforcement officers to whom he admitted (after waiving Miranda rights) the killing of Arthur Williams.  Jail Staff reported that they had performed the 1:00 AM cell check and found nothing out of order.  At the 2:00 AM cell check, Williams was discovered dead.  Patterson advised the investigating officers that he and Williams had been cellmates for approximately two weeks.  Patterson stated that he was aware of the

charges against Williams, and had planned to kill him the entire time they shared a cell.  Patterson further advised that he prepared for the murder by hanging a blanket around the window and door to the cell so that staff would be familiar with it.  Patterson stated that he waited until after the 1:00 AM cell check after which he dragged Williams out of his bunk and beat him with his fists and feet, stomping his head and slamming him on the floor repeatedly; Patterson admitted that he continued to beat Williams even after he died. Patterson was subsequently charged and convicted of murder pursuant to Florida Statute section 782.04.

61.    The method, means and motive of Williams's murder was similar to the method, means and motive of Patterson's murder of Scott Collinsworth at the Apalachee Prison in October, 2015.

## Count I – Violation of Civil Rights pursuant to 42 USC section 1983 under the 8th Amendment

62.    Plaintiff realleges the allegations of paragraphs 1 through 61.

63.    At all times material, the Defendants jointly operated and were responsible for the management and operation of the Jackson County Jail. Management and operation of the Jackson County Jail includes assurance that the Civil Rights of inmates such as Williams are protected, especially pursuant to the 8th Amendment of the Constitution.  As pertains to Williams's

Constitutional Rights, the Jackson County Jail had rules and guidelines – the Classification Policies – referred to above regarding proper placement of inmates.   Moreover, the Defendants knew or should have known that Williams was adjudicated mentally incompetent by a Circuit Court Judge prior to his murder and ordered to be transported to the DCF.   Yet, Williams was never so transported.   Further, the Defendants knew that Williams cell-mate Patterson had previously committed murder of a cellmate because of his alleged sexual orientation.   Notwithstanding all of this knowledge, and their presumed Classification Polices, the Defendants permitted, tolerated and caused a pattern of conduct that resulted in the violation of Williams's 8th Amendment rights at the hands of Patterson.   The Defendants violated their own Classification Polices evincing willful and wanton disregard for the rights of Williams and utterly failed to protect him from a known murderer. Here, all while acting under color of law, the Defendants knowingly disregarded their own policies designed to protect inmates such as Williams, and knowingly or recklessly ignoring the Order of the Circuit Court declaring Williams incompetent.   None of the foregoing would have occurred, particularly the death of Williams at the hands of Patterson, if Defendants pattern of conduct regarding practices of placement of inmates and prompt adherence to Orders of the court were an actual practice of the Jackson

County Jail. Additionally, the practice of compliance with Classification Policies, and with actual and prompt compliance with Orders of the Circuit Court would have prevented the death of Arthur Williams.

64. The Defendants were deliberately, callously, or recklessly indifferent to the rights of inmates, particularly Williams, in that they instituted a custom or policy of negligently, recklessly, or willfully failing to properly screen inmates, including both Patterson and Williams, and assign inmates appropriately; specifically, Defendants utterly failed to protect Williams in a circumstance where it was reasonably anticipated that a person charged with the violations of law such as Williams would be in grave danger if placed in a cell with prisoner having Patterson's history as stated herein. As result, Williams suffered a horrific and gruesome death.

Wherefore, the Plaintiff, Shelley Williams, as Personal Representative of the Estate of Arthur Williams, prays that his Honorable Court enter Judgment against Defendants, Jackson County; Jackson County Jail and Correctional Facility ("Jackson County Jail"); the Jackson County Board of County Commissioners ("County Commissioners"); The State of Florida ("Florida"); Florida Department of Corrections ("FDC"); Chris Brannon, Warden, Jackson County Jail and Correctional Facility ("Warden Brannon") for all damages allowed by law, including costs as

allowed and reasonable attorney's fees.

## Count – II Wrongful Death pursuant to Florida Statute

## Sections 768.28 and 768.16 – 26

65.    Plaintiff realleges the allegations of paragraphs 1 through 61.

66.    At all times material, Defendants, jointly, operated and managed the Jackson County Jail.

67.    At all times material, Defendants acted by and through their employees, agents, officers, directors, commissioners, and other representatives.

68.    At all times material, Defendants, jointly, had the duty to exercise reasonable care in carrying out their responsibilities as the operators and managers of the Jackson County Jail, including the duty to protect inmates, including Arthur Williams, from unreasonable dangers, and specifically to follow their Classification Policies as alleged herein. Notwithstanding their duties alleged herein, the Defendants, jointly, breached their duties so as to legally, directly and proximately cause the wrongful death of Arthur Williams.

Wherefore, the Plaintiff, Shelley Williams, as Personal Representative of the Estate of Arthur Williams, prays that his Honorable Court enter Judgment against Defendants, Jackson County; Jackson County Jail and Correctional Facility ("Jackson County Jail"); the Jackson County

Board of County Commissioners ("County Commissioners"); The State of Florida ("Florida"); Florida Department of Corrections ("FDC"); Chris Brannon, Warden, Jackson County Jail and Correctional Facility ("Warden Brannon") for all damages allowed by law, including costs as allowed.  Plaintiff further demands a trial by jury.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on any issues so triable.

Dated January 13th, 2020.

Respectfully submitted,

**Curt David Obront, Esq.**

**OBRONT COREY, PLLC**

Florida Bar No. 402494

Co-Counsel for Plaintiff

100 South Biscayne Boulevard, Suite 800

Miami, Florida 33133

Phone: (305) 373-1040

Fax:    (305) 373-2040

_Domingo C. Rodriguez, Esq._

**Domingo C. Rodriguez, Esq.**

**RODRIGUEZ LAW OFFICE, LLC**

Florida Bar No. 394645

Co-counsel for Plaintiff

95 Merrick Way, Suite 720

Miami, Florida 33134

Phone: (305) 774-1477

Fax:  (305) 774-1075